Opinion issued April 25, 2002





 



 





In The

Court of Appeals

For The

First District of Texas






NO. 01-00-01280-CV






CAUSEWAY PARTNERS 1, LTD., Appellant


V.


KINNEY SHOE CORPORATION T/A FOOTLOCKER, Appellee






On Appeal from the 333rd District Court

Harris County, Texas

Trial Court Cause No. 99-00476






O P I N I O N

 Appellant, Causeway Partners 1, Ltd., sued appellee, Kinney Shoe Corporation,
trading as Footlocker, for breach of its lease of retail space in Galvez Mall Shopping Center. 
Following a bench trial, the court rendered a take-nothing judgment in favor of Footlocker. 
Causeway appeals, contending in two points of error that Footlocker did not establish any
affirmative defenses and also contending that Causeway established its claim as a matter of
law. 

BACKGROUND


 The facts of this case are not disputed. Footlocker entered into a 10-year lease
agreement with Aetna Life Insurance Company to lease 2,300 square feet in Galvez Mall in
Galveston, Texas in December 1988. In December 1994, Causeway purchased Galvez Mall
and was assigned the leases in effect at that time. At the time of the purchase, the mall had
an occupancy rate of approximately 18 percent, consisting of 12 paying tenants, one tenant
in bankruptcy who was not paying rent, and one automated photography booth that did not
pay rent. 

 Before purchasing the mall, Causeway contracted with Outlet Concepts, Inc. (OCI)
to find outlet stores as tenants for the mall. According to the agreement, if OCI was
successful in developing the mall as an outlet mall, OCI would become a partner with
Causeway. The agreement restricted OCI to the redevelopment of the mall as an outlet mall. 
Causeway also hired CB Commercial to develop other tenants, such as restaurants and retail
or discount stores. Because Causeway thought a stigma had attached to the name "Galvez
Mall," it intended to change the name of the mall to "The Island." Local newspapers
publicized the fact that changes were to be made at the mall, and, during 1995, plans for the
renovation became common knowledge. During the 19 months Causeway operated the mall,
Causeway did not lease to any new tenants. 

 Between December 1994 and September 1995, seven of the paying tenants left the
mall as their leases expired. (1) Thus, in September 1995, the remaining tenants and the date
their leases expired were as follows: (1) Footlocker, November 30, 1998; (2) General
Nutrition, January 31, 1999; (3) Payless Shoe Store, November 30, 1998; (4) Lane Bryant,
January 31, 1999; and (5) Ritz Camera, who became a month-to-month tenant on August 31,
1995. 

 Causeway negotiated with Lane Bryant to terminate the store's lease so that Causeway
could tear down a wall during its renovations of the mall. As a result, Lane Bryant vacated
the premises by agreement during the fall of 1995 or early 1996. Payless Shoe Store vacated
the mall in January 1996 without any protest or action by Causeway. Footlocker issued a
check for rent dated January 1, 1996, stopped payment on the check, and vacated the mall
shortly thereafter. The record does not show when Ritz Camera left the mall, but, by June
1996, General Nutrition was the only remaining tenant. Causeway asked General Nutrition
to vacate the mall, and, in July 1996, Causeway closed the mall. 

 From at least December 1994, when Causeway bought the mall, until the time the mall
was closed, there was no foot traffic inside the mall. (2) Footlocker was dependent on foot
traffic for a large part of its business. Although Footlocker continued to show a profit, its
sales decreased at a rate of 20 percent per week during 1995. Footlocker's total profit for the
first 10 months of 1995 was $15,800, and the reason for closing the store was the lack of foot
traffic. 

 Causeway sued Footlocker for breach of the lease agreement and sought, as damages,
payment of the remaining 35 months rental and attorney's fees. Footlocker, in its answer,
asserted various affirmative defenses, including breach of the implied warranty of suitability
for commercial purposes and constructive eviction. 

 Thomas Doyle, district manager for Footlocker, testified at trial that he visited the
Galvez Mall Footlocker in October 1995 during operating hours. He found only four stores
in the mall, no customers in the mall, and a parking lot that was nearly empty. 

 Stephen Fincher, president of Baxstep Investments, Inc., Causeway's general partner,
testified that, when they purchased the mall, they had two or three different possibilities for
revitalization, but had no definite plans. He stated that they did not intend to close the mall. 
He testified that Footlocker may have had notice of Causeway's plans during 1995 to
revitalize the mall because OCI was talking to a different division of Footlocker about the
outlet mall concept and Footlocker may have read about the plans in the newpaper or seen
brochures about it. Fincher also testified that there was no set plan for an outlet mall or a
retail mall; there was just a plan for revitalization of the mall. 

 Fincher testified that Footlocker's abandonment of the mall severely crippled the
mall's operation because Footlocker represented 50 percent of the available cash for
operational functions. However, he stated that the rental income from the tenants did not
cover taxes and debt service. He testified that, without Footlocker's rent payments,
Causeway could no longer pay such expenses as the electric bill, and they closed the mall. 
Causeway then rented the two largest retail spaces to two churches, which provided security
and exterior landscape maintenance in lieu of rent. Shortly after the churches moved in, the
City of Galveston condemned the mall for city code violations, and, as a result, its lender
accelerated the mortgage. Causeway then filed for bankruptcy. 

 After the trial court rendered a take-nothing judgment in favor of Footlocker,
Causeway did not request findings of fact and conclusions of law. 

DISCUSSION


Standard of Review

 When, as here, findings of fact and conclusions of law have been neither requested
nor filed, all necessary findings of fact to support the judgment are implied. Worford v.
Stamper, 801 S.W.2d 108, 109 (Tex. 1990). When, as here, a reporter's record is brought
forward, these implied findings may be challenged for both legal and factual sufficiency. In
a legal sufficiency review, to determine whether there is some evidence to support the
judgment, the reviewing court considers only the evidence favorable to the judgment. Id. 
If the judgment can be upheld on any legal theory that finds support in the evidence, it must
be affirmed. Id. In reviewing for factual sufficiency, we must consider all the evidence and
must uphold the challenged finding unless the evidence is so weak or the finding is so against
the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. 
In re Estate of Johnson, 781 S.W.2d 390, 391 (Tex. App.--Houston [1st Dist.] 1989, writ
denied). 

Analysis

 In its first issue, Causeway claims that there is no evidence, or factually insufficient
evidence, to support Footlocker's claim of constructive eviction.

 In order to prove its claim of constructive eviction, Footlocker must establish the
following four elements: (1) an intention on the part of the landlord that the tenant shall no
longer enjoy the premises, which intention may be inferred from the circumstances; (2) a
material act or omission by the landlord or those acting for him or with his permission that
substantially interferes with the use and enjoyment of the premises for the purpose for which
they are let; (3) the tenant's permanent deprivation of the use and enjoyment of the premises;
and (4) the tenant's abandonment of the premises within a reasonable time after the
commission of the act. Columbia/HCA of Houston, Inc. v. Tea Cake French Bakery & Tea
Room, 8 S.W.3d 18, 22 (Tex. App.--Houston [14th Dist.] 1999, pet. denied); Downtown
Realty, Inc. v. 509 Tremont Bldg., Inc., 748 S.W.2d 309, 311 (Tex. App.--Houston [14th
Dist.] 1988, no writ); Stillman v. Youmans, 266 S.W.2d 913, 916 (Tex. Civ.
App.--Galveston 1954, no writ); see also Steinberg v. Med. Equip. Rental Servs., Inc., 505
S.W.2d 692, 696-97, (Tex. Civ. App.--Dallas 1974, no writ). 

 The evidence shows that, although Causeway claimed to be redeveloping the mall,
there were no specific plans for redevelopment, and Causeway appeared to be considering,
simultaneously, two different concepts--a regular retail center and redevelopment as an
outlet mall. During the entire 19 months Causeway operated the mall, it acquired no new
tenants and did not sign renewal leases with any tenants whose leases expired. There was
also evidence that sections of the mall were closed off, there was no foot traffic inside the
mall, and there was construction work in the mall, even though there were no new tenants. 
Based upon the evidence, the trial court could have concluded that Causeway's intention to
deprive Footlocker of the use and enjoyment of the premises permanently became clear only
after Causeway permitted or encouraged other tenants to vacate the premises before their
leases had expired. 

 Viewing these facts under our standard of review, we hold that there was legally and
factually sufficient evidence from which the trial court could have found the necessary
elements of constructive eviction. Accordingly, we overrule Causeway's first issue. 


Conclusion

 Having determined that there was sufficient evidence to support Footlocker's
affirmative defense of constructive eviction, we need not reach Causeway's remaining issues. 

 We affirm the judgment. 



 Sam Nuchia

 Justice

Panel consists of Justices Mirabal, Nuchia, and Price. (3)

Do not publish. Tex. R. App. P. 47.4. 

1. The record does not reflect whether or when the two non-paying tenants
vacated the mall. 
2. Stephen Fincher, president of the general partner of Causeway Partners, Ltd.,
defined foot traffic as shoppers who go to a mall to window shop or have a specific
destination, but then meander through the mall and look at other stores. He testified that, in
their situation, shoppers would go directly to Footlocker to buy shoes and then leave the mall. 
He said, "I'm not counting that as foot traffic."
3. The Honorable Frank C. Price, former Justice, Court of Appeals, First District
of Texas at Houston, participating by assignment.